Pittsburgh Screw and Bolt Corporation v. Commissioner.
Pittsburgh Screw & Bolt Corp. v. Commissioner
Docket No. 108804.
United States Tax Court
1943 Tax Ct. Memo LEXIS 129; 2 T.C.M. (CCH) 747; T.C.M. (RIA) 43414; September 7, 1943
*129 Petitioner claimed and respondent allowed as deductions during the years 1929 to 1938 various amounts for amortization of patents, depreciation of machinery and equipment, and other expenses claimed to be attributable to cost of developing profitable production of propeller blades. Petitioner sold assets consisting of patents, patent applications, machinery, equipment, etc. in 1939. In computing the cost basis of assets sold petitioner included as part of cost the amounts theretofore deducted as expense. Respondent disapproved petitioner's cost basis and deducted therefrom the amounts theretofore allowed as expense. Held, the proof does not establish that petitioner's method of computation more accurately reflects income. Paul G. Rodewald, Esq. and David B. Buerger, Esq., 1025 Union Trust Bldg., Pittsburgh, Pa., for the petitioner. Orris Bennett, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $102,243.01 in the income tax of the petitioner for the year 1939. The petitioner claims an overpayment of $28,919.03 of its tax for that year. The primary issue is whether in computing the gain from the sale of the *130 assets of petitioner's Propeller Division and consisting of patents and patent rights, machinery and equipment, tools, etc., petitioner may capitalize certain costs and expenses claimed to have been incurred for research, invention and development of patented hollow propellers, which costs were charged to expense and deducted in its tax returns for preceding years. By an amendment to his answer the respondent raised the issue that the petitioner is estopped from capitalizing such expenditures. Findings of Fact Certain facts were stipulated and as so stipulated are adopted as findings of fact. In so far as they are material to the issues, the stipulated facts are as follows: On November 1, 1939, the petitioner sold to Curtiss-Wright Corporation for $1,333,139.46 the assets of that part of its business known as the Propeller Division. Such assets consisted of patents, application for patents, machinery and equipment, furniture and fixtures, drawings, patterns, shop records and models, inventory and tools. In its income and excess profits tax return for the year 1939 the petitioner reported a gain of $678,850.07 from the sale of the patents. In such return the petitioner reported *131 a loss of $43,653.44 from the sale of the remaining assets. In its return for 1939 the petitioner deducted as "other expenses and losses" an item "Capitalization of Propeller Division costs - 1929-1938, $392,022.99." The amount of $392,022.99 represents certain Propeller Division expenditures deducted as expenses by the petitioner on its books of account for the years 1929 to 1938, inclusive, and on its income tax returns for those years. In his notice of deficiency the respondent increased the reported gain of $678,850.07, from the sale of the patents, by the amount of $157,779.50, representing the amount of the item, "Restoration of Propeller Amortization, 1929-1938," shown on the return, and computed a gain of $51,172.66 from the sale of the other assets by an adjustment of $94,826.10, representing the amount of the item, "Restoration of Propeller Depreciation, 1929-1938 to Cost," shown on the return. The deduction of $392,033.99 was disallowed and added to income with the explanation: "The capitalization of Propeller Division costs claimed in the amount of $392,022.99 have been disallowed as those were allowed as deductions in prior years." The said amount of $157,779.50 represents *132 the total of deductions for exhaustion of patent costs in its Propeller Division taken by the petitioner on its books of account and on its tax returns for the years 1929 to 1938, inclusive. The said amount of $94,826.10 represents the total of deductions for depreciation of Propeller Division assets taken by the petitioner on its books of account and in its income tax returns for the same years. For the years 1929, 1930, 1934, 1936, 1937 and 1938 the respondent, upon audit and investigation by revenue agents, in his determination of the income tax liabilities of petitioner for those years, allowed as to each year those portions of the amounts of $157,779.50, $94,826.10 and $392,022.99, which petitioner had deducted in its returns for those years. The income tax returns of the petitioner for the years 1928 to 1938, inclusive, were in each case filed on March 15 of the succeeding year. No agreement consenting to any extension of time for the collection and assessment of income taxes for these years has been executed by the respondent and the petitioner except to the extent set forth in the following excerpt from a letter dated May 9, 1941, addressed and delivered to the internal *133 revenue agent in charge: The taxpayer undertakes, irrespective of the bar of any statute of limitations, to pay any additional taxes for prior years, together with interest thereon, resulting from the disallowance in such years of any of such items as may be restored to cost in computing its capital gain in 1939 upon sale of its propeller division. The net income or loss of the petitioner as shown by its income tax returns for the years 1929 to 1938, and the income or loss of the petitioner as adjusted by revenue agents' reports, which were not protested by the petitioner, for the years 1929 to 1938, were as follows: Returns
Revenue Agent's Report
Year
Income
Loss
Income
Loss
1929
$2,701,725.82
$2,830,901.79
1930
1,583,801.16
1,601,656.13
1931
$553,955.37
$553,955.37
1932
888,848.42
888,848.42
1933
151,595.68
151,595.68
1934
146,934.28
156,638.28
1935
131,489.47
131,489.47
1936
915,480.82
922,472.17
1937
1,538,410.82
1,532,388.62
1938
347,936.66
343,139.84
The record discloses the following additional facts: The petitioner is a corporation, with its principal office in Pittsburgh, Pennsylvania. It filed its *134 income tax return for the year 1939 with the collector of internal revenue for the 23rd district of Pennsylvania. In 1929 the petitioner purchased the assets of Dicks Aeronautical Corporation, hereafter called Dicks, consisting of a basic patent granted May 14, 1929, covering the welding of a hollow steel propeller blade, and a few blueprints. The seller had no equipment. The hollow steel blade was stronger and lighter than a blade of duralumin, an alloy of a aluminum and copper. The problem in constructing a hollow steel propeller blade was to make it sufficiently strong to withstand the stress of whirling. Under the Dicks patent the tapered plates are welded behind the leading and trailing edges in order to shield the welded material from impacts with flying particles in the air. At the time of the petitioner's purchase of the Dicks patent rights three pairs of blades had been made. No tools were available for manufacturing this type of hollow steel blade, and there was no similar type of blade. At the same time efforts were made to combine the blade and hub in a lighter unit than a similar duralumin blade and hub. The petitioner immediately set aside a corner of its plant for *135 the development of the article. Machines and other equipment were secured, and in a short time the petitioner produced blades. The petitioner was the pioneer in the hollow steel propeller blade construction. Many difficulties had to be overcome. Successive developments demanded new tools which the petitioner had to design and manufacture. The petitioner had to develop its own methods and to correct as best it could the weak points in design and construction, appearing under test. Dynamic balance of the blade, resistance to stress and fatigue, shaping and welding, and securing a proper alloy were the principal problems to be solved. The United States Army Air Corps was particularly interested in the blade invention and its production. It had testing facilities at Wright Field, Dayton, Ohio, where the petitioner's blades were sent to determine their performance. The petitioner had no equipment for subjecting its blade to the whirl test, the purpose of which is to determine the structural efficiency of the propeller and thus to insure safety in flying. During the period from 1929 to 1938, inclusive, about 100 whirl tests were given by Army officials to blades produced by the petitioner. *136 Many blades failed to meet these tests and various causes of failure were discovered. Methods were suggested by the Army officials to eliminate those causes. The Armp and Navy cooperated in the development work by paying high prices for the blades, providing the testing apparatus, conducting supplemental experiments at Wright Field, and constantly consulting with the petitioner. Experimental and development work was being carried on at Wright Field at the close of 1938. Subsequent to the issuance of the basic patent in May 1929 supplemental patents were issued to James H. McKee, chief engineer and manager of the petitioner's Propeller Division, and assigned by him to the petitioner. These patents covered improvements in the manufacture and construction of hollow steel propeller blades and related to the problems of balancing, tempering, milling, filleting, vibration and other factors essential in producing an efficient blade. The application for the first of this series of patents was dated April 1, 1932 and the last patent was issued November 18, 1941. In 1933 the quality of steel furnished by the steel manufacturers was found to be not high enough to permit automatic hydrogen *137 welding. The petition spent some years in trying to develop a satisfactory steel. Only one company, the Jessup Steel Company of Washington, Pennsylvania, was willing to produce steel of the required grade, and the petitioner had to advance the money needed in the making of the steel. Successive extensive experiments ending in 1938 determined the exact steel content essential to the manufacture of the blade. Beginning in 1934 the petitioner accepted commercial orders but claims of faults and errors which called for changes compelled the petitioner to expend additional amounts for labor, engineering and executive time, change of tools and manufacturing methods, and other costs. The orders came from the United States Army Air Corps and many changes in design and construction were required by its officers. The Navy Department also desired a continuation of the petitioner's experimental and development work, and ordered blades whose cost was charged to its "Experiments and Development" appropriation. From 1929 through 1936 nearly half of the blades produced by the petitioner were scrapped by it. The remaining blades were delivered to the Army Air Corps and the Navy Department and to *138 the Bureau of Standards for testing, and also to aircraft companies for experimentation. No sales resulted from the last named deliveries. In 1935 the wet magnaflux method of inspection was discovered, whereby otherwise undiscoverable defects could be revealed without destroying the blade. Its use in inspection was thereafter required by the Army Air Force. The various inventions and processes patented from 1932 to 1941, as above mentioned, progressively contributed to the perfection of the blade. These related chiefly to milling, edge thickening, welding, rolling of camber members, fillet insertion, and the use and procurement of the proper type of copper. The experimental work continued through 1938. Varying percentages of time, ranging from 5 per cent to 100 per cent, were devoted by officers of the petitioner to the Propeller Division and its work. Computed on the basis of the salaries of these officials, the aggregate compensation for such work paid to them by the petitioner during the years 1929 to 1938, in connection with the Propeller Division, was $132,774.56. During the period from 1929 to 1938, inclusive, the petitioner's several departments, such as accounting, auditing, *139 filing, purchasing and traffic, rendered services to the Propeller Division at an aggregate cost of $62,000. The petitioner's gross expenditures for the Propeller Division during the years 1929 to 1938, inclusive, covering materials, salaries, supplies, fuel, traveling expenses, depreciation, amortization of patents, maintenance and other such expenses amounted to $2,101,265.47. The sales of blades for the same period amounted to $1,122,022.60. Closing inventory was $266,234.65. The excess of expenditures over receipts during the period, plus inventory, was $713,008.22. Blades sold and blades scrapped during the years 1936, 1937 and 1938 were as follows: 1936
1937
1938
Blades sold
1,102
913
1,031
Blades scrapped
1,046
244
229
On several occasions in 1934, 1935 and 1936 the petitioners' officers made efforts to dispose of its Propeller Division to the Curtiss-Wright Corporation, but that company was not interested. The sale to the Curtiss-Wright Corporation was consummated in November 1939. Opinion VAN FOSSAN, Judge: As we understand the facts, petitioner sold the assets of its Propeller Division for $1,333,139.46. It reported a gain of $678,850.07 from the *140 sale of patents and a loss of $43,653.44 from the sale of the other assets. Petitioner also deducted as "other expenses and losses" an item called "Capitalization of Propeller Division Costs - $392,022.99." The respondent added to petitioner's income, inter alia, three items, (1) $157,779.50 "capital gain, Propeller Division," being the amount of the amortization claimed by and allowed to petitioner in prior years on its patents; (2) $94,826.10 "gain from sales in Propeller Division for property other than capital assets," being the depreciation claimed and allowed on such property in prior years; (3) $392,022.99 "development expense capitalized, Propeller Division," being the item above referred to as claimed by petitioner as other expenses and disallowed because deductions aggregating this amount had been claimed and allowed as expense in prior years. In its petition petitioner alleges as follows: Subsequent to its acquisition of certain patentable inventions relating to the manufacture of aircraft propellers, the petitioner conducted experimental and development work on such inventions at a cost of $819,895.45. Such cost included expenditures for designs, drawings, *141 patterns, models and work of an experimental nature calculated to result in improvement and development of such inventions as the basis of the petitioner's propeller business. In his said determination the Commissioner erroneously failed to increase the said adjusted basis by any part of the said amount of $819,895.45. In its income tax return for the year 1939 the petitioner erroneously increased the said adjusted basis by only the amount of $644,628.59, and paid income tax to the said collector in the amount of $124,895.56 on the quarterly due dates. The respondent answered with general denials and by an amendment to his answer alleged that petitioner took deductions during the years 1929 through 1938 for exhaustion of patents, for depreciation, and for expenses aggregating or exceeding the amounts of $157,779.50, $94,826.10 and $392,022.99, respectively; that respondent accepted and approved such returns and is now prohibited by the statute of limitations from assessing or collecting additional taxes for such years; that petitioner is now estopped from asserting that the amounts mentioned should have been capitalized and added to the basis for determining gain on the sale of the *142 Propeller Division assets in the year 1939. The parties stipulated in effect that petitioner had claimed and respondent had allowed during the years 1929 to 1938 deductions corresponding to the stated amounts of $157,779.50, $94,826.10 and $392,022.99. At the hearing the petitioner introduced evidence tending to show that in the years 1929 to 1938 the total cost of operation of its Propeller Division amounted to $2,101,265.47 while total receipts from sales and inventory amounted to $1,388,257.25, making a net loss of $713,008.22. This sum petitioner claims in its brief represents the amount of experimental and development expense which should be capitalized and considered as part of the cost of the assets sold in 1939. Petitioner makes an equitable gesture and "undertakes, irrespective of the bar of any statute of limitations, to pay any additional income taxes for prior years, together with interest thereon, resulting from the disallowance in such years of any such items as may be restored to cost in computing its capital gain in 1939 upon sale of its Propeller Division." Remembering that the basic question that we have for determination is the cost basis of the assets sold, *143 the theory of proof on which the petitioner hopes to win is far from clear. Apparently it has pitched its case on the broad generalization that it was engaged exclusively in research and development work respecting its product and since its operations were in the aggregate unprofitable over a period of ten years, the amount by which its cost exceeds its income must represent the cost of research and development which should be added to the cost basis of the assets sold. This is despite its current treatment of the cost as expense and notwithstanding the successful claiming of deductions for amortization of patents and depreciation of assets year by year. Thus petitioner proposes to capitalize its aggregate loss and call it cost of developing its product. Petitioner's experience, however, differs not at all from the experience of many manufacturers in developing a profitable business. Lean and unprofitable early years are a common experience in all industry. The Propeller Division was but part of petitioner's operations. It will be noted that the business of petitioner as a whole had five profitable years and five loss years during the ten-year period in question. By the terms of the *144 contract of October 24, 1939, petitioner sold and the purchaser bought "the following described assets". Schedules particularly describing and itemizing each item are attached. In respect of these various items respondent increased the gain on sale as originally determined by petitioner and submitted in its tax return. He also added as an item of income the large item of $392,022.99 claimed as expense and disallowed because claimed and allowed in prior years. Thus we are brought back to the basic fact that the cost basis of the assets sold is our fundamental question. Referring to the assets sold, the contract of sale allocated to the basic patent the sum of $876,035.80 as its part of the purchase price. This patent had been issued in 1929 and acquired by petitioner in the same year. Its cost became fixed at that time. Ten years' exhaustion had been recovered by deductions claimed and allowed in petitioner's tax returns. Though we know the cost basis used by petitioner in its return, the cost of the patent was not proved at the hearing before this Court. Similarly, of the total purchase price $97,337.31 was allocated to some 19 other patents and some nine patent applications. No *145 cost was proven as to these patents or patent applications. In the same way, $183,359.02 of the purchase price is allocated to "machinery, equipment, tools, etc." but no costs were proven nor were we advised of the year by year depreciation claimed and allowed on specific assets. Inventory was listed in the contract of sale at $133,267.87, while the total of closing inventories for the years 1929 to 1938 was otherwise shown to aggregate $266,234.65. This disparity was not explained. The generalization which characterizes petitioner's theory of proof also applies to the proof itself. Syncronization of the specific proof with the specific items is lacking. The petitioner produced proof to establish that its operations in the period 1929 to 1938 were unprofitable, - specifically that it spent $713,008.22 more during those years than it received from sales. Addressing ourselves to petitioner's theory, it is argued as a major premise that during all of this time petitioner was not in commercial production but was engaged in development work and therefore its loss should be capitalized. We are unable to accept either petitioner's premise that it was engaged exclusively in research and development *146 or the conclusion petitioner suggests as a consequence. Commercial production and profitable production are not necessarily interchangeable terms. A firm may be engaged in commercial production although the same is unprofitable. It likewise may be engaged in commercial production although engaged in research and development at the same time. It will be noted that during the 10-year period petitioner realized $1,122,022.60 from the sale of propeller blades. The chairman of the board of petitioner testified that commercial orders were received beginning in 1934. The fact that due to manufacturing difficulties such orders were unprofitable does not derogate from the fact that they were commercial orders. Nor can we agree with the conclusion petitioner asks us to adopt. There are many border-line cases in the matter of accounting. It may well be questioned if the best accounting practice in a business such as petitioner was conducting is not to charge research and development costs to expense and if true income is not better reflected thereby. Especially would this seem to be true in the present instance when we remember that petitioner's basic patent, and most valuable asset, was issued *147 in 1929. Petitioner's practice through all the years preceding the taxable year was in accord with the above suggested procedure. It was only in 1939 when it faced a large tax on the sale of the Propeller Division assets that it was suggested that the previous system was wrong. The record does not satisfy us that the petitioner's practice, followed with the approval of the respondent during the period 1929 to 1938, was erroneous and did not accurately reflect income. The Revenue Acts and all tax accounting are based on a fundamental concept of an annual accounting. Petitioner's system served this end. Petitioner claimed, and respondent approved, deductions for amortization, depreciation, and other expense items year by year. It has not been demonstrated that the proposed deferment or capitalization of all the costs in question is a better system or would more accurately reflect income. See . Though the record is not clear, the item of $392,022.99 was apparently claimed as an item of expense in the 1939 tax return. The return was not submitted in evidence but we know from the notice of deficiency *148 that the item was disallowed by the respondent. The composition of this item and just where it is hidden in petitioner's operating costs we can not determine. It is easy in this case to be led astray from the central issue by dwelling on the generalizations advanced by the petitioner. We repeat that we are here concerned with ascertaining the cost basis of the assets sold in 1939. Just how the item last above referred to was tied into the computation of the petitioner's gain on the sale of the assets does not appear, but on petitioner's theory the costs composing this item are presumptively included in the net total claimed by petitioner as development costs. The assets sold, however, consisted of patents, patent applications, machinery, equipment, tools, etc. We have indicated the absence of certain basic elements of proof as to some of these items. We have also indicated our inability to accept petitioner's basic theory that the cost basis of these assets at the time of sale is to be determined by the arithmetical process of subtracting petitioner's receipts from its total expenditures. The solution is not so simple as that. Being unable to accept petitioner's theory of proof and *149 the proof being insufficient otherwise to prove respondent to be in error in his determination, we sustain the respondent. Respondent also pleads estoppel. By reason of our decision above reached on the merits of the proof submitted, we deem it unnecessary to rule on this issue. Decision will be entered for the respondent.